INTERNATIONAL UNION, UNITED
MINE WORKERS, Plaintiff–
Appellant,

Hattie Mae Hilliard, Plaintiff,

v.

JIM WALTER RESOURCES, INC.,
Defendant–Appellee.

No. 92–7102.

United States Court of Appeals,
Eleventh Circuit.

Nov. 8, 1993.

John L. Quinn, Robert M. Weaver, George N. Davies, Longshore, Nakamura & Quinn, Birmingham, AL, for plaintiff-appellant.

Robert H. Stropp, Jr., Gen. Counsel, UMWA, Intl. Union, Washington, DC, for Intl. Union, UMWA.

John W. Hargrove, Bradley, Arant, Rose & White, Birmingham, AL, for defendant-appellee.

Before BIRCH, DUBINA and BLACK, Circuit Judges.

DUBINA, Circuit Judge:

The United Mine Workers of America (the "Union") appeals the district court's grant of summary judgment in favor of Jim Walter Resources, Inc. ("JWR"). The district court held that under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2102(a) ("WARN"), no combination of JWR's four separate mines constituted a "single site" of employment and the April 1992 layoffs were not "mass layoffs" under the provisions of WARN. Therefore, the district court concluded that prior to laying off employees, the sixty days notice to workers was not required. For the reasons that follow, we affirm the judgment of the district court.

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

The Union is a labor organization and the collective bargaining representative of the employees of JWR. The Union brought suit in June 1992 after 640 workers were laid off by JWR in April 1992. The Union claims that the layoffs constitute a mass layoff within the meaning of WARN and that JWR's

failure to provide sixty days advance notice of the layoff was in violation of WARN.

JWR operates four coal mines west of Birmingham, Alabama. The parties refer to the mines as Mines 3, 4, 5, and 7. Mine 3 is located in Jefferson County, Alabama, near Adger, Alabama. Mines 4, 5, and 7 are located in Tuscaloosa County, Alabama. The number of. layoffs at each mine and the percentage of workers affected are reflected in the chart below:

| Mine | No. of Workers Before Layoffs | No. of workers Laid Off | Percentage Laid Off |
|------|-------------------------------|-------------------------|---------------------|
| 3 | 657 | 140 | 21.31% |
| 4 | 695 | 165 | 23.74% |
| 5 | 518 | 166 | 32.05% |
| 7 | 641 | 169 | 26.37% |

The Union contends that the layoffs constitute a "mass layoff," and that the four mines constitute a "single site." JWR moved for summary judgment on the grounds that the four mines failed to meet the statutory definition of a "single site" of employment and that the layoffs were not "mass layoffs" in the context contemplated by WARN. The district court concluded that the Union failed to demonstrate that at least three of JWR's four separate mines constituted a "single site" of employment as required by WARN and granted JWR's motion for summary judgment. The Union then perfected this appeal.

## II. ANALYSIS

A motion for summary judgment may be granted only if no genuine dispute remains as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), *Federal Rules of Civil Procedure.* As with all questions of law, we review the district court's order granting summary judgment under the *de novo* standard of review. *See Woodruff v. United States Dept. of Labor,* 954 F.2d 634, 636 (11th Cir.1992) (per curiam). On review, we view the record in the light most favorable to the non-moving party, with all reasonable inferences drawn in that party's favor. *NAACP v. Hunt,* 891 F.2d 1555, 1560 (11th Cir.1990). We also review *de novo* a district court's interpretation and application of a statute. *Williams v. Homestake Mortgage Co.,* 968 F.2d 1137, 1139 (11th Cir.1992).

WARN requires that an employer provide sixty days notice to workers before ordering a mass layoff. 29 U.S.C. § 2102(a). JWR argues that the layoff in question was not a mass layoff and, therefore WARN does not apply. WARN defines a mass layoff as a reduction in force that

(B) results in an employment loss at the single site of employment during any 30–day period for—

(i)(I) at least 33 percent of the employees (excluding any part-time employees); and

(II) at least 50 employees (excluding any part-time employees); or

(ii) at least 500 employees (excluding any part-time employees); . . .

29 U.S.C. § 2101(a)(3)(B). The Union contends that JWR violated section 2101(a)(3)(B)(ii) because JWR laid off at least 500 employees from a single site of employment. The Union can satisfy the statutory requirement that at least 500 workers be laid off from a single site of employment only by aggregating the layoffs from three of the four mines.

In the absence of a statutory definition of the term "single site of employment," both parties refer to the Department of Labor's interpretative regulations, which provide examples of what should and should not be considered a single site of employment. *See* 20 C.F.R. § 639.3(i) (1992). While the regulations do not restrict the definition to a single building or address, they suggest that when a single employer has a series of sites that operate autonomously, those sites should not be considered a single site. Those kinds of sites are defined by the regulations as follows:

(4) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.

(5) Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate work forces are considered separate single sites of employment.

A Department of Labor discussion paper further illuminates the definition of a single site:

The common thread in determining what is a single site would appear to be a sufficient degree of geographic contiguity as well as an operational connection. Several buildings which are part of a "campus" would be an obvious example of a single site. On the other hand, geographically separate buildings (i.e., several blocks or miles apart) would not appear to constitute a single site unless they were part of a single operation. An example of such an exception might be two warehouses several blocks apart sharing the same staff and equipment.

9A Ind.Empl.Rights Man. (BNA) 595:954 (1988).

The Union argues that there is a factual dispute over whether JWR's separate mines are independent. The Union's argument focuses on the facts that (1) Mines 4, 5 and 7 are geographically contiguous; (2) Mines 4 and 5 are connected underground; (3) coal from Mine 5 is moved to Mine 7 for rail loading and coal from Mine 3 is moved to Mine 4 for drier fuel; (4) JWR relies on coal production from each mine to satisfy contract specifications rather than filling orders from one mine only; and (5) JWR's Central Mining Office exercises significant control and authority at each mine site over the provision of supplies and equipment, the negotiation of collective bargaining agreements, the initiation of safety programs, and the decisions to lay-off employees. These facts, however, do not demonstrate that the mines should be considered a single site. Assuming *arguendo*, that the underground connection of Mines 4 and 5 is sufficient to establish that these mines are a single site, the layoffs from these two mines would total 331 employees. This is insufficient to trigger notification under WARN. See 29 U.S.C. § 2101(a)(3)(B). Additionally, there is no evidence that Mines 3 and 7 are so connected with Mines 4 and 5 as to constitute a single work site.

The district court characterized the Union's argument as centering on the fact that the Central Mining Office has de facto operational control of all four mine sites. The district court noted that the evidence submitted by JWR demonstrates that each mine has its own complement of employees and that each mine's management team has real organizational and operational responsibility for its respective mines. The district court found the Union's attempt to blur the distinction between a single site and a single employer unsuccessful. The regulations distinguish between a single site and a single employer by stating that "[a]n employer may have one or more sites of employment under common ownership or control." 29 C.F.R. § 639.3(a). The district court found that the Union's evidence did not dispute the fundamentally distinct personnel and management structure at each mine.

In our review of the district court's findings, we are not aided by many court decisions. The few cases dealing with the issue of what constitutes a single site of employment under WARN are consistent with the regulations. In *Salyer v. Universal Concrete Products*, 940 F.2d 662 (6th Cir.1991), the court referred to the definition of a "single site of employment" found in the regulations to determine that a concrete plant and a concrete bridge beam plant, located fifty to sixty feet apart and operated by the same employer, did not constitute a single site of employment. Central to the court's reasoning was the fact that the two plants were under separate management, produced different products, and had separate workforces. *Id.*

Similarly, in *Carpenters District Council v. Dillard Department Stores, Inc.*, 790 F.Supp. 663 (E.D.La.1992), the district court held that four different business locations (a planning department, a retail store, and two

warehouses) were not a single site of employment under WARN. *Id.* at 667–68. In so concluding, the court relied on the following factors: (1) although all locations were in New Orleans, they were several miles apart; (2) personnel were assigned to a particular location; (3) personnel who worked in more than one location—engineers, electricians, and carpenters—did so because they were responsible for repair and maintenance, but in fact, they were assigned to one location for employment purposes; (4) each location had its own manager; (5) the two warehouses operated independently of each other; and (6) a centralized payroll and some common personnel functions were not enough to deem the locations a "single site." *Id.*

In our determination of whether the sites in the present case should be considered a "single site of employment," we find persuasive the legislative history of WARN. According to the Conference Report, the conferees removed all references to "place of employment" and replaced them with "single site of employment." Apparently "[t]his change is intended to clarify that geographically separate operations are not to be combined when determining whether the employment threshold for triggering the notice requirement is met." *United Paperworkers Local 340 v. Specialty Paperboard, Inc.*, 999 F.2d 51, 56 (2nd Cir.1993) (citations omitted).

The district court properly concluded that none of JWR's four mine sites should be considered together as a "single site of employment" under WARN. First, the mines are managed independently with a different Mine Manager, Assistant Mine Manager, Industrial Relations Supervisor, Safety Supervisor, and Strata Control Engineer at each mine. Second, the mines do not ordinarily share employees. While some exceptions exist, employees do not rotate among mine sites, nor do they work regularly at more than one mine.[1] The hourly employees at the four mine sites are represented by four different union locals. Also, employees at

one mine may not bid on a job vacancy at another mine; they may only bid on job vacancies at the mine in which they presently work. Third, each mine site is considered separate by the federal government and the Union. The Mine Safety and Health Administration ("MSHA") treats each mine separately, granting separate permits and mine numbers. MSHA requires each mine to have its own ventilation and safety plans. Moreover, Tom Youngblood ("Youngblood"), the president of District 20, testified at his deposition that the Union never would have more than one local at the same mine site. Each mine has its own Union officers who are paid by the respective local. Youngblood testified that when separate mines have separate management and separate employees, the Union normally considers the mines to be separate. Finally, each mine has its own gate, parking lot, office building and bathhouse.

The Union's allegation that JWR's Central Mining Office exercises significant control and authority at each mine site is insufficient to persuade us that the mine sites should be considered a "single site of employment." These allegations relate to overall corporate management, not to the essence of WARN—the day-to-day management and personnel. JWR corporate management ordered mine management to reduce coal tonnage and cost per ton. Corporate management informed each mine manager of his tonnage and cost requirements for the coming year. There was no further guidance given. Corporate management issued no instructions regarding layoffs. The layoff decisions were made by individual mine management.

■ The Union also argues that the four mines share the same "operational purpose" and thus must be considered a single site. The only shared "operational purpose" is that all the mines produce coal. This alone is insufficient to classify several non-contiguous sites as one. The DOL regulations state that

---

1. Employees may be shared among the mines in two situations: (1) when corporate employees perform corporate functions for the various mine sites (e.g., the legal department or the transportation department); and (2) in emergencies (e.g., some Mine 3 supervisors performed temporary work at other mine sites after a major hoist accident idled Mine 3).

(4) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.

20 C.F.R. § 639.3(i) (1992). While the phrase "operational purpose" is vague and undefined, it may imply that non-contiguous sites—at the very least—share *some* management and personnel. It clearly must mean more than "produce the same product." The mines at issue all produce coal, but they do so independently of one another. Each mine's tonnage requirements are different, and the production of coal at one mine does not depend on the production of coal at another mine. Their "operational purposes," beyond the production of coal, are not coextensive.

### III. CONCLUSION

The Union fails to demonstrate that any combination of three of the four mine sites should be considered together as a "single site of employment" under WARN. The undisputed facts confirm that the day-to-day management and employee structures at the four mines are fundamentally distinct. Accordingly, we affirm the district court's grant of summary judgment.[2]

AFFIRMED.

---

2. The parties also raise the issue whether the district court properly denied the Union's motion for a trial by jury. Since we affirm the district court's grant of summary judgment, we need not reach this issue.